In the

# United States Court of Appeals
## For the Seventh Circuit

—————

No. 06-2428

JOHN M. FLOYD & ASSOCIATES INCORPORATED,

*Plaintiff-Appellant,*

*v.*

STAR FINANCIAL BANK,

*Defendant-Appellee.*

—————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 01 C 355—**Theresa L. Springmann**, *Judge.*

—————

ARGUED JANUARY 19, 2007—DECIDED JUNE 7, 2007

—————

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This diversity case comes to us
after the district court entered partial summary judgment
in favor of the defendant. The plaintiff appeals. For the
reasons set forth below, we affirm.

## I. BACKGROUND

Because we are reviewing entry of summary judgment in
favor of the defendant, we will construe the facts in favor
of the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 255 (1986). John M. Floyd & Associates is a consult-
ing firm that provides services to banks. Early in 2000,

Floyd entered into an agreement with Star Financial Bank. The agreement proposed four phases of the engagement. In the "analysis" phase, Floyd would analyze current operations at the bank and come up with recommendations and a plan to implement the changes. During the "presentation" phase, Floyd would meet with Star to determine which recommendations Star would like to pursue. During the third phase, which Floyd's proposal referred to as the "installation" phase, Floyd would coordinate and assist in the installation of approved changes and install monitoring processes to track how the changes were working. In the final "follow-up" phase, Floyd consultants would meet with Star to review the results and fine-tune any implemented changes.

The parties now dispute whether Star was obligated to pay for two changes that Floyd recommended. First, Floyd recommended that the bank initiate an overdraft privilege program. Under such a program, instead of returning overdrawn checks unpaid, the bank would honor many of those checks and would charge customers a fee for the privilege of overdrawing their account. Second, Floyd recommended that Star sell its portfolio of credit card accounts to a major national credit card issuer.

Star asked Floyd not to implement either of these ideas. But eventually the bank installed similar programs either on their own or through another vendor. Shortly after Floyd made the "presentation" phase on the overdraft protection, Star contacted a company called Stratis Technologies to install overdraft protection. Stratis had been pursuing Star since the prior year. According to Floyd, Stratis implemented substantially the same type of program that Floyd had offered to implement, but was willing to do it for roughly one fifth of what Floyd intended to charge Star. Star also implemented Floyd's recommendation to sell its consumer credit card portfolio, but used a different vendor for that sale. Star had been in intermittent contact with a company called Kessler

Financial Services for about four years before Floyd's consulting work began. Kessler acted as an agent for MBNA, then a large national bank with extensive credit card portfolios, in trying to acquire the types of credit accounts that Floyd recommended Star should sell. About a month before Floyd moved to the presentation phase on the credit card sale recommendation, Star had re-opened contacts with Kessler and had raised the topic of selling Star's credit card assets to MBNA.

Floyd's proposal to Star had set the compensation to be contingent on savings from Floyd's recommendations. The cost to Star would be "one-third of the first-year's pre-tax earnings that are the results of [Floyd's] recommendations plus out-of-pocket expenses." R. 1 Ex. A p. 2. The contract also provided that "[t]he bank will have the final decision as to the installation of recommendations and only approved and installed recommendations will be used to quantify earnings." *Id*. The parties agree that Floyd did not install or follow-up on either of these recommendations because Star went elsewhere. When Star implemented the types of programs that Floyd had recommended, Floyd sued Star for the contingent fees that Star would have owed if Star had used Floyd for those two changes. After discovery, both parties moved for summary judgment on the question of breach of contract. The district court granted Star's motion for summary judgment. There were other claims between the parties that eventually went to trial, but those are not before us on this appeal. The only issue presented for review is whether summary judgment in favor of Star was appropriate on the facts recounted above.

## II. ANALYSIS

This is a question that requires us to interpret the contract between Floyd and Star. The parties agree that

Indiana law controls. Under Indiana law, "[w]hen the terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract or look at extrinsic evidence but rather will simply apply the contract provisions." *Forty-One Assoc., LLC v. Bluefield Assoc., L.P.*, 809 N.E.2d 422, 427 (Ind. Ct. App. 2004) (citing *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind. Ct. App. 1997)). Floyd argues that the contract requires that Star pay for any recommendation that Floyd made, even if Star hired somebody else to implement it or made the changes internally, without the help of a consultant or other contractor. Star argues that the contract only obligates it to pay for changes if Floyd recommends and installs them (or coordinates the installation). Although the terms of the contract make it clear that final payment would not be made until about a year after the changes were installed, the parties are basically disputing when the obligation to pay for a recommendation arose under the contract.

To interpret the contract in the way that Floyd asks us to would require that we add terms to the contract that are not contained within the four corners of the document. We are unwilling to do this. The contract does not envision that Star would pay for ideas, but rather for action. In the paragraph entitled "Payment," Floyd's proposal states that the bank would "have the final decision" on any recommendation and "only approved and installed recommendations" would be used to quantify earnings. R. 1 Ex. A p. 2. This is clear language that the obligation to pay did not arise after analysis or presentation of recommendations, but only after a change was installed. By the very terms of the contract, installation required that Floyd would "coordinate and assist in installation of approved changes [and] design and install monitoring and reporting mechanisms. . . ." *Id.* p. 5. The language here is unambiguous: the obligation to pay could not arise until a change was installed.

Floyd argues that by reading the installation clause in the contract this way the district court erred by treating Floyd's installation obligations as a condition precedent instead of a condition subsequent. Appellant's Br. at 24-25. Under Indiana law, there is a presumption against conditions precedent. Floyd cites to *Scott-Reitz Ltd. v. Rein Warsaw Assoc.*, 658 N.E.2d 98, 103 (Ind. Ct. App. 1995) to support this argument. We recognize, however, that the term "condition precedent" carries multiple meanings, and can refer to a condition precedent to the formation of a contract, or a condition precedent to an obligation that arises under an already existing contract. *See* JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS § 11-5 (2003). Floyd urges us to read the stated obligations in the installation phase as being a condition subsequent: that is, that failure to perform those actions renders the contract void. Floyd's argument is that we should not read the list of required actions in the installation phase as being necessary for the obligation to pay to arise, but rather that a failure to perform those tasks would void an already existing obligation to pay. There is, of course, a third interpretation: that the language is not at all conditional, but was one of a series of interlocked promises that the parties made to each other. *See id.* § 11-09 ("[I]n this area it is clear that the courts, in a doubtful case prefer the interpretation that particular language is language of promise rather than language of condition."). Nevertheless, discussion of whether the term should be considered a condition precedent or subsequent simply begs the question of whether the obligation to pay arises if somebody other than Floyd makes the installation of the recommended changes.

We come back to the language of the contract, which sets the measure of the payment at one-third of the benefit of the recommendations that are "accepted and installed." But installed by whom? Floyd's request for payment might

still be valid if the contract provides that Star would pay for installed recommendations, even if Floyd was not involved in the installation. It makes sense that consultants might choose to enter a contract that provides for reimbursement for their ideas even if somebody else actually installs the recommendation. It could be that a consultant puts so much effort into arriving at the recommendations that the lion's share of the work has been done by that point. This is, at its heart, Floyd's argument here: "Floyd conferred a substantial benefit on Star through its thorough analysis and its persuasive recommendation . . . ." Appellant's Br. at 46. In such a case, even if the measure of payment is determined by looking at the savings after the fact, parties might agree that the obligation to pay arises when the recommendation is made.

For example, Floyd could have written into the contract that Star would be obligated to pay Floyd for any recommendation that was installed within twenty-four months of their engagement, even if somebody other than Floyd performed the installation. But Floyd did not write that term into the proposal it sent to Star, so it is not part of the contract between the two parties. We note that Floyd submitted supplemental authority to the court under FED. R. APP. P. 28(j) regarding a contract that Floyd had drafted with a different bank which *did* include a term that more specifically spelled out the bank's obligation to pay for recommendations implemented within a set time period after the engagement, even if the change was originally rejected. *See John M. Floyd & Assoc., Inc. v. Ocean City Home Sav. Bank*, 206 F. App'x 129 (3d Cir. 2006).

Floyd also could have written an exclusivity clause into the contract and required that Star refrain from using another banking consultant to implement any change that Floyd recommended for some time period after the engagement. But Floyd did not write that clause into the con-

tract either. To give the contract the meaning that Floyd urges would even require that Star pay Floyd for recommendations that other consultants might have made as long as they were also among the recommendations that Floyd included in its list. By Floyd's logic, if Star had hired two sets of consultants with contracts that were identical to the contract that Floyd drafted, and if each consultant had made the exact same recommendations that Floyd made, Star would have been obligated to pay *both* consultants, even if a third party actually did the work installing the overdraft system. This seems to be well beyond the "plain and usual meaning" of the words used in the contract. *Dempsey v. Carter*, 797 N.E.2d 268, 273 (Ind. Ct. App. 2003); 6 IND. LAW ENCYCL. CONT. § 64.

Floyd is stuck with the language of the contract as it is written, and the language is clear. The contract terms, as drafted by Floyd, gave two powerful options to the bank. The bank received a right to unilaterally remove certain projects from the compensation formula and there were no limits on Star's ability to shop around for better deals from other providers. Taken together, this language shifted the burden of risk onto Floyd that some of its up-front work would not result in compensation. We have mentioned, in passing, some of the clauses that Floyd could have inserted to protect that compensation interest. But Floyd did not insert any of that language. Failing to bind Star to pay for Floyd's work earlier in the engagement might have been slipshod contract drafting, but a slipshod contract is not necessarily an ambiguous contract. We are left to enforce the contract as we find it—a contract that left Star free to pick and choose which recommendations to adopt and free to shop for a more competitive quote from other consultants and service providers.

### III.  Conclusion

The terms of the contract between Floyd and Star are unambiguous. The agreement does not require that Star exclusively consult with Floyd, and the contract does not require that Star pay for the preliminary ideas that Floyd presented. The district court was correct that Star did not breach its contract with Floyd when it used other vendors to implement the overdraft policy and sell its credit card portfolio. Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*